Docket No. 81609–Agenda 3–March 1998.

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. MADISON HOBLEY, Appellant.

Filed May 29, 1998

JUSTICE BILANDIC delivered the opinion of the court:

Following a jury trial in the circuit court of Cook County, the defendant, Madison Hobley, was found guilty of seven counts of felony murder, one count of arson, and seven counts of aggravated arson. The charges related to an arson fire in which seven persons died and several other persons were injured. Following a sentencing hearing, defendant was sentenced to death. This court affirmed defendant's convictions and death sentence on direct appeal. 
People v. Hobley
, 159 Ill. 2d 272 (1994). Defendant's petition for a writ of 
certiorari
 was denied. 
Hobley v. Illinois
, 513 U.S. 1015, 130 L. Ed. 2d 491, 115 S. Ct. 575 (1994).

Defendant subsequently filed a second-amended petition for post-conviction relief, which the circuit court dismissed without conducting an evidentiary hearing. He appeals to this court from the dismissal of that post-conviction petition. 134 Ill. 2d R. 651(a). We now affirm in part and reverse in part, and remand to the circuit court for an evidentiary hearing.

FACTS

Trial Evidence

The evidence presented at defendant's trial is detailed in part in this court's opinion on direct appeal. 
Hobley
, 159 Ill. 2d 272. Because an understanding of the trial evidence is necessary to evaluate the first claim presented in defendant's post-conviction petition, we present a summary of that evidence.

State's Case

The State's evidence showed that, on January 6, 1987, at approximately 2 a.m., a fire broke out in a multiple-unit apartment building at 1121-23 East 82nd Street in Chicago. The fire claimed the lives of Anthony Bradford, Johnny Mae Dodds, Shelone Holton, Schalise Lindey, and Robert Stephens, as well as Anita Hobley and Philip Hobley, defendant's wife and infant son. The cause of death for each victim was acute carbon monoxide toxicity.

The apartment building consisted of four floors: the garden-level English basement and the first, second and third floors. The building was long and narrow, with an inside stairwell located at its front and an outside stairwell located at its rear. A single hallway ran the length of each floor and could be accessed by both stairwells. The top three floors each contained seven apartments, numbered _01 through _07. The fire was located in the front stairwell of the building, nearest the apartments numbered _01 and _02.

At the time of the fire, defendant lived in apartment 301 with his wife and son. Apartment 301 was located directly across from the front stairwell on the third floor.

Investigation revealed that gasoline, an accelerant, was used to start the fire. The front stairwell completely collapsed as a result of the fire. Tests of stairwell debris revealed the presence of gasoline in the front stairwell. Experts for both the State and the defense agreed that the fire was intentionally set with gasoline somewhere in the front stairwell.

Tests of the area outside of apartment 301 revealed no traces of gasoline. The door and door jam of apartment 301 were burned almost completely.

A firefighter called to the scene saw that the fire was burning hotter on the third floor, and he smelled the presence of gasoline in the burning stairwell.

While the fire still raged, firefighters discovered four bodies in the third-floor hallway. Another body was found in the second-floor hallway. A firefighter located the bodies of Anita and Philip Hobley inside of apartment 301, lying to the right of the window up against the wall. He testified that, when he arrived, the door was shut but burned off. The window had been stripped or blown out. Some furniture in the apartment had melted tops, which evidenced the enormous heat that had been in the apartment. He smelled the odor of gasoline.

Louis Casa, the building manager, testified that he rented apartment 301 on November 12, 1986, to defendant. A woman named Angela McDaniel was also there. Casa was under the impression that defendant and McDaniel would live together. Casa was not aware that at some time between November 12, 1986, and the day of the fire, McDaniel had moved out and defendant had moved his wife and son into the apartment.

Two witnesses testified regarding a gasoline purchase on the night of the fire. Andre Council testified that he was visiting Kenneth Stewart while Stewart worked at an Amoco station located at 83rd and Cottage Grove in Chicago. Council parked his car next to a gasoline pump. Sometime after midnight on January 6, 1987, Council saw a man walk up to the station. The man was carrying a gasoline can and asked to purchase one dollar's worth of gasoline. Council was not certain of the size of the can, but he said it looked like a one-gallon can. Council made an in-court identification of defendant as the man who had purchased the gasoline. Council described defendant as wearing a navy blue or black pea coat, a hat and jeans while at the station.

Council stated that the man then left the station, walking toward the direction of the building. Sometime later, fire trucks passed the station. Council left because he lived near the direction where the fire trucks were heading. After a brief stop at home, Council went near the fire. While there, he again saw the man, now standing near the viaduct, about two houses away from the fire. Council claimed that the man was wearing the same thing as when he saw him at the Amoco station. When Council later saw defendant on television as a suspect in the fire, he called police and told them about the gasoline purchase.

The second witness, Kenneth Stewart, was working at the Amoco station on the night of January 5 and 6, 1987. He recalled that a short man purchased one dollar's worth of gasoline with a standard red and yellow gasoline can. The can was a one-gallon can. Stewart acknowledged that the gasoline can introduced as People's exhibit 8 was a two-gallon can, but said that it looked similar to the can he saw. Stewart witnessed a lineup at 4 p.m. on January 6, 1987. After some difficulties, Stewart stated that defendant “favored” the man who purchased the gasoline. He also stated that he could not tell with “any degree of certainty.” At trial, Stewart expressed more certainty, but acknowledged that he saw the man's face for only three to four seconds.

A number of professionals investigated the fire to determine its cause. One of them was Fire Marshall Francis Burns. He testified that the extreme heat outside of apartment 301, and the damage sustained at that location, evidenced that an accelerant had been poured on the floor outside the door of apartment 301. He also stated, however, that if the door to apartment 301 had been left open and a window inside the apartment was open, the fire would have been drawn to apartment 301 more intensely because fire seeks oxygen.

Detective Virgil Mikus, a Chicago police officer then assigned to a federal arson task force, arrived at the scene at 3:10 a.m. and was assigned to investigate the cause and origin of the fire. As part of his investigation, he examined the exterior and interior of the building, and collected debris samples for examination. Mikus testified that a flammable liquid was poured in front of apartment 301. As evidence of this, he noted a circular pour and burn pattern outside the apartment door with a four to six foot diameter, and that the roof and baseboards had been completely burned.

Chicago police Detectives Robert Dwyer and James Lotito also investigated the fire. At about 9 a.m. on January 6, 1987, Dwyer and Lotito interviewed defendant at his mother's home after determining that he had been a tenant of apartment 301. Dwyer, Lotito and defendant sat in Dwyer's vehicle, and Dwyer told defendant that the fire had been intentionally set and asked defendant if he had any idea who may have done it. Dwyer testified that defendant mentioned a suspicious fire in the building on December 31, 1986. Defendant also mentioned that he suspected a woman named Angela McDaniel, with whom he had previously had an affair. Defendant then agreed to accompany the officers to Area Two Police Headquarters (Area 2).

 After arriving at Area 2, Dwyer learned information that contradicted defendant's story. Defendant was read his 
Miranda
 rights so that he could be questioned again. Defendant gave Dwyer the address and telephone number of McDaniel.

 Defendant was then taken to another area police headquarters, at 11th and State Streets, where he was interviewed by Sergeant Patrick Garrity. In the meantime, Dwyer and Lotito interviewed McDaniel over her lunch hour. Garrity testified that no one else was present during their interview. According to Garrity, defendant first denied involvement with the fire, but mentioned his suspicions of McDaniel. Garrity told defendant that he had reason to believe that he was lying. Defendant then allegedly broke eye contact and made an admission. Garrity testified that defendant told him that he had gone to a gasoline station with a can, purchased gasoline, poured it in the stairwell and in the hallway outside his apartment, lit the gasoline with a match, and then threw the gasoline can down the second-floor hallway. Defendant said that he did this because he was experiencing trouble with his girlfriend Angela and his wife. Garrity took notes during this interview, but those notes stated only that defendant made “admissions.” Garrity stated that he did not write down defendant's confession, but rather notified the investigating detectives.

 Subsequently, Dwyer interviewed defendant in an interview room. Lotito and Officer McWeeney were either in or just outside of the room during this time. Dwyer testified that defendant repeated his confession to him. Defendant also told Dwyer that he could not handle his wife anymore and that he wanted to be with McDaniel in the future. Defendant was then allowed to speak to his attorney, who had arrived, and was then taken to the lineup. After the lineup, Dwyer was escorting defendant back to Area 2 when they were approached by reporters. Defendant told the reporters that the police have the wrong man.

Dwyer testified that he took notes of defendant's confession, but those notes do not exist anymore. Dwyer destroyed them because “They were a mess. Quite frankly they were soaking wet. You know, ink was running on them. Once I completed my report I no longer had need for the notes and it is my custom that if I don't need them to just discard them.” The report that still exists was written on January 31, 1987. Dwyer denied ever physically brutalizing or racially harassing defendant.

Detective John Paladino testified that when he started his shift on the afternoon of January 6, 1987, another officer contacted him and told him to go to the fire scene and locate a gasoline can on the second floor. He also spoke with Dwyer. Paladino went to the fire scene and found the gasoline can inside of apartment 206 in the kitchen under the sink. He located the arson investigators and had them take photographs of the can. Paladino found the can at 5 p.m. on January 6, 1987. This two-gallon can was introduced at trial as People's exhibit 8.

Paladino further testified that the black powder appearing on the can at trial appeared to be fingerprint powder. He stated that the can had been sent to the crime lab for fingerprint testing.

Some tenants testified about the night of the fire. Debra Bedford of apartment 302 testified that her apartment was directly across the hall from apartment 301. After being awakened by a smoke alarm, she touched her front door and noticed that it was hot. She did not open the door. She called the fire department. She then sat in her window for about 10 to 15 minutes as her apartment filled with extreme heat and smoke. The fire department finally arrived and rescued her with a ladder.

After her rescue, Debra Bedford saw defendant at the scene of the fire. He was upset. Defendant told her that he thought his wife and baby were still in there, and that he thought maybe they were behind him as he ran out. Defendant was wearing a short jacket, like a pea coat, and pants, but no shoes. Bedford testified further that the coat introduced as defense exhibit 1 looked like the coat defendant was wearing. She examined the coat and noted that it is a ladies coat, since it buttons on the left side.

Althea Tucker of apartment 203 testified that she went to the window when she realized the building was on fire. Her brother Curtis Tucker, who had just escaped from apartment 207, called for her to throw her children down. From her window, Tucker saw defendant near the viaduct, which was two houses away. Defendant ran toward the building. Defendant then helped her brother catch her son when she dropped him from the window. Defendant was wearing a T-shirt and pants, but no shoes and no jacket.

Angela Slatton testified that she lived in apartment 206 with Howard Wilson and her toddler daughter. Apartment 206 was near the rear of the building. She awoke after her daughter bit her. The apartment was full of smoke. She opened the door and saw that the hallway was full of smoke, real hot and dark. She closed the door. She threw her daughter out the window. Firemen then rescued her and Wilson with a ladder. Slatton denied that the two-gallon gasoline can later found in her apartment belonged to her or Wilson. This was the gasoline can introduced as People's exhibit 8.

Brian Greene, a firefighter, testified that while the January 6, 1987, fire was still burning, he entered the second-floor hallway through the back stairwell with his supervisor. Greene did not know if other firefighters had already been in the second-floor hallway. Although he was equipped with appropriate fire-fighting equipment, the heavy smoke and heat required him to crawl on the floor. He crawled halfway through the building. As he crawled, he looked at the floor. He located the body of Anthony Bradford and took it outside. Green never saw a gasoline can in the hallway.

There was brief testimony regarding an earlier fire in the building on December 31, 1986. Some tenants testified that there had been a small fire on the third floor on December 31, 1986, a few days earlier than the instant fire. Louis Casa, the building manager, fixed the damage caused by the December 31, 1986, fire. He described the damaged area as being in the third-floor landing area, about nine feet outside of apartment 301.

At the close of the State's case, defendant moved for a mistrial. Defendant argued that Detective Paladino's testimony revealed that the State had performed fingerprint testing on the gasoline can introduced as exhibit 8. Defendant asserted that he was entitled to a mistrial because the State had never disclosed to the defense that a fingerprint analysis had been performed on that can. Nor did the State disclose to the defense the results of that test. The assistant State's Attorney told the trial judge that no such fingerprint report existed. The trial judge accepted the State's representation and denied defendant's motion for a mistrial.

Defense Case

Defendant testified that he did not set fire to his apartment building and that he never confessed to doing so. Defendant admitted having had an affair with Angela McDaniel while he was married. He met McDaniel at a going-away party during the third week of October 1986. The affair lasted about one month. In November 1986, defendant rented apartment 301 in the building on 1121-23 East 82nd Street for McDaniel because she had no credit. McDaniel moved into the apartment, but defendant did not. Defendant's wife discovered the affair in mid-November 1986, after McDaniel moved into apartment 301. A week later, his wife threw defendant out of their home and told him not to return until he ended the affair. Defendant stayed with McDaniel for four days. Defendant then informed McDaniel that he was ending the affair. McDaniel moved out of the apartment after Thanksgiving Day, 1986, because she could not afford it on her own. At Thanksgiving, defendant admitted the affair to his wife's grandparents, who had raised her. He and his wife then reconciled.

According to defendant, he and his wife and child moved into apartment 301 during the week before Christmas of 1986 because it was nicer than where they were living. When defendant came home from work on December 31, 1986, there was a large burn hole in the carpeting outside their apartment. His wife told him that she and another tenant had put out a fire there. Defendant suspected that McDaniel may have had something to do with the fire because their affair had ended badly.

After New Year's Day, 1987, defendant called McDaniel and arranged to meet her at a lounge. Defendant asked McDaniel if she knew anything about the fire in the building. She asked if the fire was on the third floor, but then denied having any knowledge of the fire. McDaniel stated that she wanted the $590 back that she had put down on the apartment. When defendant said that he wanted to stay with his wife and baby, she slapped him and said that he “was going to pay for *** wasting her time.”

Defendant testified that he was home with his wife and child on the night of the fire. He was awakened that night by what he initially thought was his watch alarm. After realizing that the noise was a smoke alarm, he woke his wife and got out of bed. When he opened the hallway door, he saw and smelled smoke. Defendant told his wife there was a fire and to get the baby.

Defendant went out into the hallway to investigate, leaving the door to his apartment open. The smoke appeared to be coming from apartment 304. The smoke was low in the hallway near that apartment. Defendant was walking over to knock on the door to that apartment when he heard a popping noise. The doorway to his own apartment went up in flames. The fire had come up the stairwell. Defendant could not get back inside his own apartment. He pounded at the wall and screamed at his wife to shut the door and go to the window. Defendant then “got down low” and ran out the back door because he could not breathe.

Once outside, defendant went and stood below his bedroom window. The window was open a few inches, as it always was because the apartment tended to be warm. He saw smoke coming out of his window, but never saw his wife or baby. Defendant was wearing only a T-shirt and shorts, and was not wearing shoes.

Defendant ran to the front of the building where some people had gathered. He was looking for help to get his wife and baby out. A man gave defendant some oversize pants to wear.

After defendant put the pants on, he could see fire trucks driving by. He ran after the trucks, but could not catch them, so he ran back to the building. He helped a man catch a baby who was being thrown out a window. He then saw flames coming out of his apartment. Defendant went back to the front of the building searching for help. There he saw Debra Bedford, whom he knew. He told Bedford that he did not know if his wife and baby got out of the fire and asked to use a telephone. He went into the house next door, called his mother and asked her to bring him and his family some clothes. A lady then gave him some gym shoes to wear.

When defendant went back toward the building, he saw a fireman. He asked the fireman to save his wife and baby, and pointed to his window. The fireman told him that some people had been rescued from the third floor and he should go around the back. There, a policeman told him to check the trauma units in the front. He went to the trauma units. He saw a lot of confusion and people everywhere. He returned to the house next door and called his mother again.

Once outside again, defendant could see that all the windows to his apartment had been broken out by the firefighters. Flames were coming out of his apartment. A woman came up to him and wrapped a coat around him. Defendant asked a firefighter if he knew if his wife and baby had been saved, and he said no. His mother, Myra Hobley, then arrived at the fire scene with her landlord.

Defendant told his mother that he could not find his wife and baby. They were hugging and crying. His sister Robin Milan then arrived. Robin directed their mother to take him home, and Robin stayed to look for defendant's wife and baby.

At his mother's house at 8006 South Rhodes, several relatives began arriving. They called hospitals searching for defendant's wife and child. Robin arrived a short time later stating that she could not find Anita or Phil at the fire scene.

Robin called for an ambulance for defendant. Defendant was taken to St. Bernard's Hospital in Chicago, where Robin asked that he be given a sedative. When the doctors informed her that tests would be needed first, Robin took defendant back to his mother's house.

Later in the morning, police officers arrived at his mother's home. Defendant's mother gave the officers the clothes he was wearing during the fire. The officers then told defendant to come out to their car. They questioned defendant about the fire and asked him if he had any enemies. Defendant told the officers about his affair with McDaniel and how it had ended badly. The officers then took defendant to Area 2 headquarters to avoid the news media.

At Area 2, Detective Dwyer placed defendant in an interview room, handcuffed him to a wall ring, and began to physically abuse and racially harass him. Later, defendant was taken to 11th and State after giving out McDaniel's telephone number. There defendant was asked a series of questions by Sergeant Patrick Garrity. When defendant denied setting the fire, Garrity kicked him. Defendant denied that he confessed to Garrity that he had set the fire.

Detectives Dwyer and Lotito and Officer McWeeney escorted defendant to another room where he was again handcuffed. Defendant complained that his handcuffs were too tight. The officers hit and kicked defendant and told him to confess. Lotito put a plastic typewriter bag over his head until he blacked out. When he regained consciousness, Dwyer told defendant that they had interviewed McDaniel. Defendant was then allowed to see a lawyer, Steven Stern, and was placed in a lineup.

As defendant was being escorted back to Area 2, the media was there. A reporter asked defendant why he did it. Defendant said, “I didn't do it. They got the wrong person. I didn't do it.” A videotape of this discussion was entered into evidence. Therein, defendant denies setting the fire, denies knowing who set the fire, and says he awoke to a smoke detector.

On cross-examination, defendant admitted having had some difficulties with his wife after Thanksgiving, 1986. On November 30, 1986, he took his son away from his wife. Defendant also admitted lying to McDaniel about his wife to convince McDaniel to have sex with him.

John Campbell, an expert in the field of fire investigation and analysis, testified that gasoline poured in the hallway outside of apartment 301 could not have been the cause of the damage to that area. Rather, the damage outside of apartment 301 was the result of a “chimney effect,” which caused the fire to burn hotter and gain intensity as it traveled up the stairwell. The fire “mushroom[ed] out” at the upper level of the stairwell, which acted like a firebox. In Campbell's opinion, accelerant actually burned only in the stairwell at a point above the entry to the building. He further opined that the fire happened exactly as defendant described it.

Robin Milan, defendant's sister, testified and corroborated some of defendant's testimony. She stated that, after she arrived at the fire, she stayed to look for defendant's wife and son while her mother took defendant home. She could not locate them. Later, she followed defendant to the emergency room so he could get a sedative. She removed defendant from the hospital when she realized how long it would take.

Myra Hobley, defendant's mother, testified and she also corroborated some of defendant's testimony. She stated that defendant was shaking and crying when she arrived at the fire scene. She took defendant to her home so he could calm down. A family member later called the paramedics because defendant “was hysterical.” The next morning, police arrived and she gave them the clothing that defendant was wearing during the fire, but forgot the coat. After realizing that she had forgotten to give the coat to police, she gave the coat to defendant's public defender on January 8, 1987. The coat was introduced into evidence as defense exhibit 1. It was a dark-colored ladies pea coat.

Penny Hobley, defendant's other sister, testified that she went to the morgue and identified the bodies of defendant's wife and son. Defendant was at their mother's house rocking and crying. At the morgue, she saw Detective Dwyer and he asked her if she knew Angela McDaniel.

Curt Tucker of apartment 207 testified that he lived there with his mother. His brother Anthony Bradford woke him and told him that there was a fire. Tucker escaped out the rear stairwell. He went beneath the window of apartment 203, where his sister lived, when he saw defendant come up from under the viaduct. Defendant was wearing pants, but no shoes. Defendant helped Tucker catch his infant nephew. Defendant told Tucker that his wife and child were in an apartment where smoke and flames were coming out the window. Later, a neighbor gave defendant some shoes. There were no fire engines at the scene when Tucker saw defendant.

Georgia White testified that she lived next door to 1121-23 East 82nd Street. During the fire, people came into her home to use the telephone and for clothing. Defendant was one of those people. When he arrived, defendant was wearing no shoes and, to her recollection, no coat. She let defendant use her telephone. She also gave defendant a pair of gym shoes to wear.

Three lawyers were attempting to locate defendant on January 6, 1987. Steven Stern was contacted by defendant's family that morning and he contacted another attorney, Terry Stallings, who agreed to speak with defendant. Stallings went to Area 2 headquarters. Upon his arrival, he was told that defendant had never been there. He waited there for 90 minutes but never saw defendant. Stallings returned to Area 2 later that afternoon with another lawyer, Oliver Spurlock, but they never saw defendant.

Stern, after learning that Stallings had not seen defendant on his first trip to Area 2, called Area 2. He learned that defendant was at 11th and State. Upon his arrival there, Stern was told that he could not see defendant yet because he was being interviewed. Stern was allowed to see defendant about 30 minutes later and observed injuries to his wrists. Defendant told Stern that the police had beaten and “bagged” him, and that they were trying to force him to confess, but he kept telling them that he did not do it. Stern then viewed the lineup.

It was stipulated that the clothes that defendant had on the night of the fire had no gasoline on them. These were the clothes that defendant gave to the police, and included a T-shirt, shorts, oversized pants, and gym shoes.

The defense also introduced evidence regarding the earlier fire in the building on December 31, 1986. It was stipulated that Battalion Chief R. Pitschen would testify that he went to 1121-23 East 82nd Street, the third-floor stairwell, in response to a fire alarm made at 5:06 p.m. on December 31, 1986. He arrived at 5:09 p.m. and left at 5:23 p.m.

Cary Widel testified that he was the branch manager of the medical company for which defendant worked. On December 31, 1986, defendant was at work from 8:30 a.m. to 6 p.m. Charles Jordan testified that he worked directly with defendant on December 31, 1986. They were together until 6 p.m., when Jordan dropped defendant off at home.

The defense also made an offer of proof concerning the two-gallon gasoline can introduced as People's exhibit 8. The trial court refused to allow defendant's expert, John Campbell, to testify regarding the location of the gasoline can, finding the testimony to be speculative. In the offer of proof, Campbell testified that he inspected the gasoline can and the photos taken of it at the scene. The photos revealed that the can was clean and in excellent condition when photographed. Campbell stated that, given its condition, the can was “nowhere near where there was any heavy fire or heavy smoke.” Upon viewing photos of the second floor, he opined that the can could 
not
 have been in the following locations: on the front stairwell, in the hallway outside the door to apartment 206, and anywhere in the hallway between the door to apartment 206 and the front stairwell.

State's Case in Rebuttal

Two paramedics gave testimony to the effect that defendant did not appear remorseful when they responded to the emergency call to give him a sedative.

It was stipulated that defendant made statements to medical personnel at the hospital that he had just lost his wife and baby in a fire. There was soot in defendant's nasal passages. Earlier expert testimony had established that both starting a fire and escaping a fire could cause soot in nasal passages.

Ollie Portwood, the grandmother of Angela McDaniel, testified that McDaniel was home at their house on the night of the fire. She stated: “Angela didn't go no further than the back yard that night. She and the girl upstairs from next door, they was playing, running and playing in the back yard, and myself and the lady next door, we was in the kitchen. We could see them, so she was out there.” She did not know where McDaniel was at the time of trial. She had not seen her in months.

Sergeant Patrick Garrity testified and denied abusing defendant. Detective James Lotito also testified and denied abusing defendant. Lotito took no notes whatsoever of defendant's alleged admissions. Lotito's notes did refer to defendant's denials of his involvement with the fire, however.

The jury found defendant guilty of seven counts of felony murder, one count of arson, and seven counts of aggravated arson, as earlier noted. The jury was polled in open court. A bifurcated capital sentencing hearing then commenced before the same jury. At the first stage, the jury found defendant eligible for the death penalty. At the second stage, the jury found no mitigating factors sufficient to preclude imposition of the death penalty. The trial court sentenced defendant to death. A summary of the evidence presented at defendant's sentencing hearing is contained in this court's opinion on direct appeal. 
Hobley
, 159 Ill. 2d at 288-90. Given that defendant has not raised any issue relating to this evidence here, we do not reiterate it.

Post-Conviction Proceedings

Defendant filed his first petition for post-conviction relief on May 30, 1995. It was amended twice thereafter. The operative petition, defendant's second-amended post-conviction petition, was filed on May 13, 1996. It was accompanied by a large group of exhibits and affidavits. It also referred to materials attached to the earlier petitions for post-conviction relief. In response, the State filed an amended motion to dismiss the second-amended post-conviction petition. After briefing and argument, the circuit court granted the State's motion to dismiss all claims in the second-amended post-conviction petition without conducting an evidentiary hearing.

Defendant's post-conviction claims, and the materials filed in support of those claims, are discussed in the analysis portion of the opinion.

ANALYSIS

This is a proceeding under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122–1 
et seq.
 (West 1994)). To obtain relief under the Act's provisions, a defendant must establish that a substantial deprivation of his constitutional rights occurred in his trial or sentencing hearing. 725 ILCS 5/122–1 (West 1994).

A defendant is not entitled to an evidentiary hearing on a post-conviction petition as a matter of right. 
People v. Albanese
, 125 Ill. 2d 100, 105 (1988). Rather, a hearing is required only when the allegations of the petition, supported by the trial record and accompanying affidavits, make a substantial showing of a violation of a constitutional right. 
People v. Del Vecchio
, 129 Ill. 2d 265, 279 (1989). For the purpose of determining whether to grant an evidentiary hearing, all well-pleaded facts in the petition and any accompanying affidavits are taken as true. 
People v. Brisbon
, 164 Ill. 2d 236, 245 (1995).

Determinations of the reviewing court on the prior direct appeal are 
res judicata
 as to all issues actually decided, and any issue that could have been presented, but was not, is waived. 
People v. Whitehead
, 169 Ill. 2d 355, 371 (1996). The doctrines of 
res judicata
 and waiver will be relaxed, however, in three situations: where fundamental fairness so requires, where the alleged waiver stems from the incompetence of appellate counsel, and where the facts relating to the claim do not appear on the face of the original appellate record. 
Whitehead
, 169 Ill. 2d at 371-72.

A circuit court's determinations regarding a post-conviction petition will not be disturbed on appeal unless manifestly erroneous. 
People v. Lear
, 175 Ill. 2d 262, 268 (1997).

I. 
Brady
 Violations and Related Claim

Defendant initially contends that his constitutional right to due process of law was violated at his jury trial because the State failed to disclose to the defense all exculpatory evidence as required by 
Brady v. Maryland
, 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963). Defendant asserts that the State's violation of his due process rights took two forms: first, the State suppressed a fingerprint report on the gasoline can that it introduced into evidence at defendant's trial; and, second, the State suppressed a second gasoline can found at the scene of the fire, and then destroyed it after defense counsel demanded its production during post-conviction proceedings.

Defendant attached items to his post-conviction petition which, he argues, demonstrate these alleged constitutional violations. The items attached to defendant's post-conviction petition include two subpoenas; the affidavit of one of defendant's post-conviction attorneys; the affidavit of a defense investigator; a lab report related to defendant's case with police record department number (RD No.) J008183; and several other police reports with RD No. J007699, including a fingerprint report and a report referencing a one-gallon can.

 For the purpose of deciding whether to grant an evidentiary hearing on defendant's 
Brady
 claims, we accept the well-pleaded facts in his post-conviction petition and its accompanying affidavits as true. See 
Brisbon
, 164 Ill. 2d at 245. We also accept the allegations of the petition where supported by the trial record. See 
Del Vecchio
, 129 Ill. 2d at 279. The allegations of defendant's post-conviction petition and the supporting evidence reveal the following.

The trial record discloses that defendant filed a pretrial discovery request on March 25, 1987. Therein, defendant requested that the State produce any report and results of fingerprint tests pertinent to the case. Defendant also requested the disclosure of all material within the State's possession or control that tends to negate defendant's guilt. Despite these defense requests for production, the State never disclosed the results of fingerprint tests performed on the two-gallon gasoline can introduced as People's exhibit 8. Nor did the State disclose that a second gasoline can was recovered from the fire scene.

The materials attached to defendant's post-conviction petition reveal that, during defendant's post-conviction investigation, he issued two subpoenas to the Chicago police department seeking the production of all reports, records, documents or other items relating to any fingerprint testing on the gasoline can introduced against him at trial and any other objects recovered from the fire scene, and the results of any such tests. The first subpoena was dated September 7, 1995, and was sent to the Chicago police department crime laboratory. The second subpoena was dated February 8, 1996, and was sent to the keeper of records, Chicago police department. Defendant's post-conviction counsel attested that, in response to the first subpoena, he was told that no records could be found under the police RD number that he had. Apparently, RD No. J008183 was the record department number assigned to defendant's case.

Defense investigator Lee Smith of the Capital Resource Center stated in an affidavit that he subsequently spoke with Ms. Millbrooks from the crime lab, who stated that some records were available. Smith also spoke with Ms. Karlic of the “laser unit,” who told him that other police inventory numbers exist that are related to defendant's RD No. J008183. Smith was then advised to call the evidence and recovered property section (ERPS) of the Chicago police department. At Smith's request, Officer Laverene of ERPS looked up the various inventory numbers Smith had been given. Laverene told Smith that inventory number 357051 was a two-gallon gasoline can that had been turned over to the State's Attorney's office on July 16, 1990. Apparently, this gasoline can was the can used by the prosecution as exhibit 8 at defendant's trial.

Smith's affidavit further states that Laverene told him that inventory number 341644 was also a gasoline can, and that this second gasoline can had been destroyed on October 6, 1995. Laverene stated that the order to destroy this can was signed by Officer Virgil Mikus. Mikus was one of the officers who investigated the fire in this case. The date of destruction was less than one month after the issuance of defendant's first subpoena to the crime lab. Although Laverene agreed to fax to Smith a copy of Mikus' order to destroy the second can, Laverene's supervisor later called Smith and told him that defendant needed a court order before any records would be produced.

Defendant's post-conviction petition further alleges that his post-conviction investigation revealed that an additional record department number other than RD No. J008183 had been assigned to records relating to the fire in this case, that being RD No. J007699. In support of this allegation, defendant attached several Chicago police department evidence and laboratory reports relating to the fire that do not contain defendant's name. All these reports contain RD No. J007699, and they list the names of victims who died in the fire. One of the reports filed under RD No. J007699 was a “Request for Analysis/Receipt for Exhibit” for the “Crime Laboratory Division/Chicago Police.” This report indicates that the two-gallon gasoline can used as an exhibit at defendant's trial was submitted for fingerprint testing on January 6, 1987. The report additionally indicates that three forms of fingerprint testing were performed on this gasoline can on January 6, 1987, and that the results of those tests were negative. A second report filed under RD No. J007699 clearly relates to the fire and it states that a one-gallon can containing debris was recovered from the ground-floor stairwell.

Defendant asserts that the foregoing evidence entitles him to an evidentiary hearing on his claim that the State violated 
Brady
 by suppressing exculpatory evidence. Defendant contends that the State violated 
Brady
 by suppressing (1) the negative fingerprint report on the gasoline can that it introduced against him at trial, and (2) a second gasoline can found at the fire scene.

The United States Supreme Court set forth the government's affirmative duty to disclose evidence favorable to a defendant in 
Brady v. Maryland
, 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963). There, the petitioner was convicted of first degree murder and sentenced to death, and his conviction was affirmed on appeal. Subsequently, the petitioner learned of an extrajudicial confession by his accomplice admitting the homicide. Although the petitioner had requested disclosure of his accomplice's statements before his trial, the prosecution had suppressed one in which the accomplice admitted committing the homicide. The Supreme Court held that the prosecutor's suppression of this confession violated the due process clause of the fourteenth amendment to the United States Constitution. The Court in 
Brady
 set forth this general rule: “the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.” 
Brady
, 373 U.S. at 87, 10 L. Ed. 2d at 218, 83 S. Ct. at 1196-97. The Court explained that this principle is not intended to punish society for the misdeeds of a prosecutor, but to ensure a fair trial for the accused and to protect the administration of justice. 
Brady
, 373 U.S. at 87-88, 10 L. Ed. 2d at 218-19, 83 S. Ct. at 1197.

To establish a 
Brady
 violation, suppressed evidence must be both favorable to the accused and material. Favorable evidence is material in this context “only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.” 
United States v. Bagley
, 473 U.S. 667, 682, 87 L. Ed. 2d 481, 494, 105 S. Ct. 3375, 3383 (1985). A “reasonable probability” of a different result is a “probability sufficient to undermine confidence in the outcome.” 
Bagley
, 473 U.S. at 682, 87 L. Ed. 2d at 494, 105 S. Ct. at 3383. In making a materiality determination, a court considers the cumulative effect of all suppressed evidence favorable to the defense, rather than considering each piece individually. 
Kyles v. Whitley
, 514 U.S. 419, 436-41, 131 L. Ed. 2d 490, 507-10, 115 S. Ct. 1555, 1567-69 (1995).

The prosecution cannot escape its duty under 
Brady
 by contending that the suppressed evidence was known only to police investigators and not to the prosecutor. 
Kyles
, 514 U.S. at 438, 131 L. Ed. 2d at 508-09, 115 S. Ct. at 1568. As the Supreme Court explained in 
Kyles
, “any argument for excusing a prosecutor from disclosing what he does not happen to know about boils down to a plea to substitute the police for the prosecutor, and even for the courts themselves, as the final arbiters of the government's obligation to ensure fair trials.” 
Kyles
, 514 U.S. at 438, 131 L. Ed. 2d at 509, 115 S. Ct. at 1568.

Applying the foregoing principles of constitutional law here, we conclude that defendant is entitled to an evidentiary hearing on his 
Brady
 claims. The trial record and defendant's post-conviction petition clearly support his claims that, despite his pretrial requests for production, the State failed to disclose to him the existence of two pieces of exculpatory evidence: (1) a report that defendant's fingerprints were 
not
 on the gasoline can introduced against him at his trial, and (2) a second gasoline can found at the fire scene.

As to the fingerprint report, the record of defendant's trial discloses that an important part of the State's case was the two-gallon gasoline can admitted as People's exhibit 8. Detective John Paladino testified about his discovery of this can at the fire scene. The discovery of this can was utilized to corroborate defendant's confession. The trial record also shows, however, that the State did not disclose to the defense that a fingerprint analysis had been performed on the can. Nor did the State disclose to the defense the results of such test. To the contrary, the State informed defendant that no such fingerprint analysis had been performed. Paladino testified that the black powder on the can at trial appeared to be fingerprint powder and that he believed the can had been sent to the crime lab for fingerprint testing. As a result of this testimony, the defense moved, at the close of the State's case, for a mistrial based on the State's failure to disclose that a fingerprint analysis had been performed on the can. In response, the assistant State's Attorney told the trial judge that no such fingerprint report existed. The trial judge accepted the State's representation and denied defendant's motion for a mistrial. Now, defendant has attached to his post-conviction petition items which indicate that, in contrast to the State's representation at trial, the State had performed three forms of fingerprint testing on this gasoline can on January 6, 1987. The results of those tests were contained in a report filed under RD No. J007699. The report stated that the test results were negative. These fingerprint results are clearly favorable to the defense.

Additionally, as to the second gasoline can, the record of defendant's trial reveals that defendant was never informed by the State that more than one gasoline can had been recovered from the fire scene. Now, however, defendant has attached to his post-conviction petition items which indicate that a second gasoline can was recovered from the fire scene. Defense investigator Smith averred that Officer Laverene of the Chicago police department informed him that a second gasoline can relating to defendant's case had been filed with an inventory number 341644. Moreover, a report relating to the fire states that a one-gallon can was recovered from the ground-floor stairwell. This report, like the negative fingerprint report, had been filed under RD No. J007699. The existence of a second gasoline can found at the fire scene is also clearly favorable to the defense.

The State contends that defendant has failed to show that these pieces of evidence were material under 
Brady
. The State separately analyzes the possible impact that disclosure of the fingerprint report may have had on the trial. Later in its brief, the State then separately analyzes the possible impact that disclosure of the existence of the second gasoline can may have had on the trial. The State's method of analysis is fundamentally flawed. As earlier noted, in making a determination of materiality under 
Brady
, the court must consider the cumulative effect of all suppressed evidence favorable to the defense, rather than considering each piece individually. 
Kyles
, 514 U.S. at 436-41, 131 L. Ed. 2d at 507-10, 115 S. Ct. at 1567-69.

We are persuaded that defendant has made a substantial showing of materiality under 
Brady
. Materiality is shown where there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. 
Bagley
, 473 U.S. at 682, 87 L. Ed. 2d at 494, 105 S. Ct. at 3383. A “reasonable probability” of a different result means a “probability sufficient to undermine confidence in the outcome.” 
Bagley
, 473 U.S. at 682, 87 L. Ed. 2d at 494, 105 S. Ct. at 3383. At defendant's trial, the defense theory was that another person had started the fire. The negative fingerprint report and the existence of a second gasoline can found at the fire scene certainly would have offered concrete evidentiary support to that defense theory. At trial, the State claimed that defendant confessed to starting the fire and to throwing the gasoline can he used into the second-floor hallway. In contrast to the State's case, defendant denied that he made any confessions. He supported this contention with his own testimony and by pointing out that the officers who testified as to his confessions had no contemporaneous documentation to support their claim. Defendant also presented the testimony of his attorney Steven Stern, who spoke with defendant immediately after his interview by the officers. Stern testified that, during this conversation, defendant told him that the police had beaten and “bagged” him, and that they were trying to force him to confess, but defendant kept telling the officers that he did not do it. Defendant further presented a media videotape taken of him as he was being escorted by a detective shortly after he was alleged to have given his confessions. A reporter asked defendant why he did it. Defendant told the reporter that he did not set the fire, that he did not know who did, and that he awoke to a smoke detector. Had defendant been given the negative fingerprint report, he would have had scientific evidence to show that his fingerprints were not on the gasoline can found inside of apartment 206. This would have provided defendant with further support for the unreliability of his alleged confession. Moreover, had the existence of a second gasoline can been disclosed, defendant would have had a piece of physical evidence that could have weighed heavily against the State's presentation of the gasoline can that it utilized against him as People's exhibit 8, and against the State's claim that this can was strong evidence of defendant's guilt.

Significantly, the trial testimony regarding the location where People's exhibit 8 was found, although used by the State to corroborate defendant's confession, was inconsistent with that confession. The officers stated that defendant confessed to them that he had thrown the gasoline can used to start the fire into the second-floor hallway. People's exhibit 8, however, was found located inside of apartment 206, under the kitchen sink. No explanation was provided at trial as to how this gasoline can, after being thrown down the second-floor hallway, made it underneath a kitchen sink inside of apartment 206. Another problem with People's exhibit 8 was also revealed at trial. People's exhibit 8 was a two-gallon gasoline can, but both men who testified at trial concerning the purchase of gasoline stated that they believed the man was carrying a one-gallon gasoline can. These inconsistencies in the State's evidence presented against defendant at trial are placed in an entirely different light once they are considered along with the suppressed fingerprint report and second gasoline can. Certainly, credibility assessments were for the trier of fact to make. Had the jury here, however, been informed of the suppressed evidence, it may well have believed defendant's testimony at trial that he never confessed to setting the fire and that he never told officers that he threw a gasoline can down the second-floor hallway. We therefore conclude that there is a reasonable probability that, had such evidence been disclosed to the defense, the result of the proceeding would have been different. Our confidence in the outcome of defendant's trial has been seriously undermined by the possibility that the State failed to disclose exculpatory evidence of this nature to the defense.

The State counters that defendant's 
Brady
 claims are barred by 
res judicata
 by virtue of his direct appeal. We disagree. Defendant's 
Brady
 claims, both with regard to the suppressed fingerprint report and the second gasoline can, are the result of a post-conviction investigation and disclosures by the Chicago police department. As such, the information upon which the claims are based are clearly outside of the trial record upon which this court's ruling on direct appeal was based (see 
Hobley
, 159 Ill. 2d at 306-08). Because the record does not contain the evidence defendant now presents, the merits of defendant's claims are properly considered. See 
People v. Orange
, 168 Ill. 2d 138, 167 (1995); 
People v. Thomas
, 38 Ill. 2d 321, 323-24 (1967) (
res judicata
 does not preclude consideration in post-conviction proceedings of “constitutional questions which, by their nature, depended upon facts not found in the record”).

 The State also asserts that defendant's 
Brady
 claims must fail because he made no showing that the items in question were in control of the prosecution at the time of trial. The State is mistaken. Contrary to the State's assumption, the law is well settled that the same 
Brady
 rules apply even where the suppressed evidence was known only to police investigators and not to the prosecutor. 
Kyles
, 514 U.S. at 438, 131 L. Ed. 2d at 508-09, 115 S. Ct. at 1568. Consequently, the State's argument must be rejected.

In conclusion, defendant has made a substantial showing that the State did in fact fail to disclose to him two items of material, exculpatory evidence that it had in its possession, in violation of 
Brady
 and its progeny. Accordingly, defendant is entitled to an evidentiary hearing on this matter. If defendant establishes the alleged 
Brady
 violations at his evidentiary hearing, he is entitled to a new trial.

An argument by the State remains to be addressed. The State contends that this case is governed by 
Arizona v. Youngblood
, 488 U.S. 51, 102 L. Ed. 2d 281, 109 S. Ct. 333 (1988), and not by 
Brady
, because the second gasoline can has been destroyed. We disagree. 
Brady
 directly addresses the State's responsibility to turn over favorable, material evidence to the defense 
upon a pretrial request
.
 Brady
, 373 U.S. at 87, 10 L. Ed. 2d at 218, 83 S. Ct. at 1196-97. Defendant has alleged in his post-conviction petition new evidence showing that the State failed to fulfill this exact responsibility. 
Brady
 therefore applies. If by this argument the State is suggesting that it can somehow eliminate a 
Brady
 violation by destroying suppressed evidence in its possession after the trial, we reject that assertion as a matter of principle.

In response to the State's argument, defendant contends that, even if 
Youngblood
 were to apply, he is entitled to an evidentiary hearing on this portion of his post-conviction petition. The Supreme Court in 
Youngblood
 considered the due process ramifications where the government fails to preserve a piece of evidence which the defendant claims would have been useful to him at trial. The Court held that “unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.” 
Youngblood
, 488 U.S. at 58, 102 L. Ed. 2d at 289, 109 S. Ct. at 337. Assuming for the sake of argument that 
Youngblood
 applies, we agree with defendant that his post-conviction petition makes a sufficient showing that the State acted in bad faith in destroying the second gasoline can. The items attached to the petition make a substantial showing that the State has acted with bad faith in suppressing exculpatory evidence throughout the course of proceedings in defendant's case, despite defendant's requests that he be given the evidence. Before his trial, defendant filed a motion for discovery requesting the production of reports pertaining to fingerprint testing and other exculpatory evidence related to the case. Despite these requests, defendant was never informed of the existence of a negative fingerprint report on the gasoline can introduced as People's exhibit 8, nor was he informed of the existence of a second gasoline can found at the fire scene. The items attached to defendant's petition indicate that these items were in the possession of the State before and during defendant's trial. Both the fingerprint analysis and the second gasoline can were apparently catalogued by the Chicago police department in reports with RD No. J007699, an RD number that defense counsel did not have at the time of trial. Defendant claims that this worked to mask the existence of these items from the defense. Later, during defendant's post-conviction investigation, he issued two subpoenas to the Chicago police department for information relating to this case. A police department employee, Officer Laverene, informed defendant's investigator, Smith, about the existence of the second gasoline can. Laverene also told Smith that this can was destroyed on October 6, 1995, on the order of Officer Mikus. That date was less than one month after the issuance of defendant's first subpoena. Defendant submits that, just as one can infer consciousness of guilt from flight, the inference here is crystal clear–that upon receipt of a subpoena regarding the theretofore successfully hidden gasoline can, the officer central to the investigation ordered its destruction. The trial record shows that Mikus testified that he arrived at the fire scene at 3:10 a.m. on January 6, 1987, and was assigned to investigate fire cause and origin. As part of his investigation, he examined the exterior and interior of the building, and collected debris samples for examination. Mikus did not testify that he recovered a gasoline can from the building. Yet it was Mikus who later ordered the gasoline can destroyed. The actual circumstances surrounding the destruction of the second gasoline can are not known because the State has refused to produce any information regarding its destruction without a court order. Considered as a whole, these facts support a finding that the State's destruction of the second gasoline can was motivated by bad faith.

In addition to a showing of bad faith, this court has stated that a due process violation under 
Youngblood
 requires a showing that the evidence lost or destroyed was important relative to the evidence presented against the defendant at trial. 
People v. Hobley
, 159 Ill. 2d 272, 307 (1994); see also 
People v. Newberry
, 166 Ill. 2d 310 (1995). Defendant has sufficiently shown that the second gasoline can was important relative to the evidence presented against him at trial. The trial established that the fire was intentionally ignited through the use of gasoline. The State proceeded on the theory that the gasoline can admitted at trial as People's exhibit 8 was used to start the fire, and used this can to corroborate defendant's alleged confession. As noted earlier, the trial testimony regarding the location where People's exhibit 8 was found was not consistent with that confession. The officers stated that defendant told them that he had thrown the gasoline can used to start the fire into the second-floor hallway, but People's exhibit 8 was found located inside of apartment 206 under the kitchen sink. No explanation was provided at trial for this discrepancy. A second problem with People's exhibit 8 was that it was a two-gallon gasoline can, even though both men who testified at trial concerning the purchase of gasoline stated that they believed the man was carrying a one-gallon gasoline can. Given these discrepancies in the State's evidence, the existence of a second gasoline can found at the fire scene was important relative to the evidence presented against defendant at trial. Moreover, the second gasoline can remained of substantial value to defendant even after his trial, in the sense that its very existence could be used to prove a 
Brady
 violation by the State. At the very least, it appears that the police located and recovered two different gasoline cans from the scene of this fire. It was not up to the police to decide that only one of these cans was relevant to the case and to deny defendant access to the other one. It strains credulity to suggest that a second gasoline can recovered from the fire scene was not important relative to the evidence presented against defendant at his trial.

The foregoing analysis shows that, even under the more stringent 
Youngblood
 test, defendant's post-conviction petition has made a substantial showing of a violation of his constitutional rights. Given this showing, we hold that, with regard to the second gasoline can, an evidentiary hearing must be held to determine whether it was suppressed by the State during trial in violation of 
Brady
, and also to determine if it was later destroyed in bad faith by the State, as contemplated by 
Youngblood
. All information surrounding the second gasoline can should be considered at the hearing. According to an affidavit attached to the post-conviction petition, the State has refused to turn over to the defense copies of its records regarding the second gasoline can without a court order. We hereby order the State to provide the defense with all the information that it has concerning the second gasoline can and its destruction. We also order the State to provide the defense with all the information that it has regarding the negative fingerprint analysis.

In remanding for an evidentiary hearing, we stress that we are deeply troubled by the nature of the allegations made in this case. Defendant has provided evidence which suggests that items favorable to the defense were suppressed by the State, and that this suppression was accomplished, in part, by cataloging evidence under an RD number that was not made available to the defense. The materials attached to defendant's post-conviction petition indicate that defendant discovered during his post-conviction investigation that an additional RD number had been assigned to records relating to the fire in this case, that being RD No. J007699. He attached several Chicago police department evidence and laboratory reports relating to the fire that do not contain defendant's name. All these reports contain RD No. J007699, and they list the names of victims who died in the fire. One of the reports filed under RD No. J007699 contained the negative fingerprint results. A second report filed under RD No. J007699 referenced the one-gallon can. Defendant seeks to make a parallel between his case and the infamous “street files” formerly used by some Chicago police detectives. See 
Jones v. City of Chicago
, 856 F.2d 985 (7th Cir. 1988); 
Palmer v. City of Chicago
, 562 F. Supp. 1067 (N.D. Ill. 1983), 
reversed by
 755 F.2d 560 (7th Cir. 1985). Although at this stage we cannot ascertain whether defendant's asserted parallel is warranted, we point this out to underscore the seriousness of these allegations and the need for a thorough evidentiary hearing on remand.

II. Actual Innocence Claim

Defendant next asserts that he is entitled to an evidentiary hearing or a new trial on his claim that he has newly discovered evidence that provides compelling evidence that he is actually innocent of the arson and murders for which he stands convicted. The newly discovered evidence defendant points to include the negative fingerprint report on the gasoline can introduced against him at trial, and the second gasoline can found at the fire scene.

Relief under our Post-Conviction Hearing Act is limited to constitutional claims. 725 ILCS 5/122–1 (West 1994). In 
People v. Washington
, 171 Ill. 2d 475 (1996), this court recognized the viability of a “free-standing” claim of actual innocence in post-conviction review. This claim is cognizable under the due process protection provided in the Illinois Constitution of 1970 (Ill. Const. 1970, art. I, §2). 
Washington
, 171 Ill. 2d at 487-89. A “free-standing” claim of innocence means that the newly discovered evidence being relied upon “is not being used to supplement an assertion of a constitutional violation with respect to [the] trial.” See 
Washington
, 171 Ill. 2d at 479. For example, in 
Washington
, a witness came forward years after the defendant's conviction and stated that two other men had committed the murder for which the defendant was convicted, and that she had not come forward sooner out of fear for her life. 
Washington
, 171 Ill. 2d at 477-78. This newly discovered evidence was deemed sufficient to grant relief. 
Washington
, 171 Ill. 2d at 489-90.

In this appeal, we have already held that the State's actions regarding the fingerprint report and second gasoline can may establish a violation of defendant's constitutional right to due process under 
Brady
. Consequently, this evidence does not support a “free-standing” claim of actual innocence. Rather, the newly discovered evidence defendant points to here 
is
 being used to supplement his assertions of constitutional violations with respect to his trial. Defendant has therefore not properly raised a claim of actual innocence under 
Washington
.

In addition, defendant briefly mentions that he has newly discovered evidence showing that the officers at Area 2 engaged in a pattern and practice of police torture. This evidence, however, is being used to supplement defendant's assertion, in part III, that his confessions were coerced and involuntary and that the introduction of these confessions violated his constitutional rights. Therefore, this evidence also fails to support a “free-standing” claim of actual innocence under 
Washington
.

In conclusion, defendant is not entitled to either an evidentiary hearing or a new trial on his actual innocence claim.

III. Evidence of Prior Police Brutality

Defendant claims that he is entitled to an evidentiary hearing on his claim that newly discovered evidence requires a new trial. The newly discovered evidence submitted by defendant consists of reports, transcripts and other documents, all of which set forth allegations by other suspects of abuse by police officers at Area 2 police headquarters. Defendant contends that this evidence would have corroborated his claim at trial that he was physically abused by police officers at Area 2 and would have established that his alleged confessions were coerced and involuntary, making their introduction at trial a violation of his constitutional rights.

Prior to his trial, defendant moved to suppress his alleged confessions to police on the ground that the statements were the result of police brutality. Defendant testified at the hearing on the motion that he was physically brutalized by several police officers at Area 2 police headquarters. Defendant stated that Detective Robert Dwyer hit and punched him repeatedly in the stomach, chest and face. Defendant also stated that Dwyer pushed his thumbs against defendant's throat and handcuffed his wrists so tightly that he experienced pain. Defendant testified that Detective James Lotito put a plastic typewriter cover over his head, cutting off his air supply and causing him to black out. Defendant further testified that both Dwyer and Lotito made racial and threatening remarks to him. Defendant further testified that, while he was at another area police headquarters, he was kicked and threatened by Sergeant Patrick Garrity. Defendant also testified that he never confessed involvement in this crime to any police officer. Dwyer, Lotito and Garrity each testified at the suppression hearing and denied that defendant was physically abused or harassed in any way. The trial court ruled that defendant's confessions were not procured through physical abuse and denied his motion to suppress on that ground.

At trial, defendant testified and again related his allegations of abuse at the hands of Dwyer, Lotito and Garrity. Defendant also reiterated his testimony that he had not made any inculpatory statements to any of these police officers. Dwyer, Lotito and Garrity testified at trial and again denied that defendant was subjected to any physical abuse. In order to corroborate his claim that he was abused by these police officers, defendant sought at trial to introduce evidence that three other persons claimed to have been physically abused by Dwyer. The State filed a motion 
in limine
 to preclude this testimony. The trial court reviewed defendant's proffered evidence and granted the State's motion to exclude it.

On direct appeal, this court affirmed both the trial court's ruling denying defendant's motion to suppress and the ruling excluding defendant's proffered testimony of other incidents of police brutality. 
Hobley
, 159 Ill. 2d at 294-95, 311-12. In affirming the denial of the suppression motion, we noted that, although photographs taken of defendant after his confession revealed scrapes on his wrists and a small bruise on his chest, defendant had not shown that he was injured by the police. Dwyer had testified that the wrist injuries were inflicted by defendant himself as he tugged at the handcuffs. With regard to the chest bruise, defendant had presented no evidence that the bruise was not present prior to his arrest. We concluded that, because defendant did not sustain any injuries consistent with his allegations of abuse, and all the police officers involved denied the alleged brutality, the trial court did not abuse its discretion in denying the motion to suppress. 
Hobley
, 159 Ill. 2d at 294-95.

We also upheld the trial court's exclusion of defendant's proffered evidence of prior acts of brutality by Dwyer. Defendant sought to introduce evidence of allegations of police brutality made by Vincent Lawson, Carolyn Tomsek and Stanley Howard. We upheld the trial court's ruling excluding this evidence. We held that the allegations by Lawson and Tomsek were not similar to those made by defendant and were therefore not relevant to defendant's case. We further held that the allegations made by Howard, although similar to those made by defendant, were properly excluded for two reasons: (1) the alleged abuse of Howard took place in 1984 and was therefore too remote to defendant's case, and (2) neither Howard nor defendant sustained any injuries consistent with their claims of police brutality. 
Hobley
, 159 Ill. 2d at 311-12.

Defendant now seeks a new trial on the ground that he has newly discovered evidence that other suspects were physically abused by some of the same Area 2 officers whom he claims abused him. In support of this claim, defendant attached to his post-conviction petition a report by the Chicago police department office of professional standards which studied allegations of physical abuse at Area 2 between 1973 and 1986 and concluded that such abuse was “systematic” during that time period. Defendant also submitted numerous transcripts of testimony by other persons alleging that they were victims of police brutality by various officers at Area 2. Defendant argues that, had this evidence been presented at his trial, the jury likely would have concluded that his alleged confessions were the product of police brutality and would therefore have reached a different result. Accordingly, defendant claims that he is entitled to a new trial on the basis of this evidence.

 The State contends that this issue is barred by the doctrine of 
res judicata
 as a result of this court's decision on direct appeal. We agree. In a post-conviction proceeding, determinations of the reviewing court on the prior direct appeal are 
res judicata
 as to all issues actually decided. 
People v. Whitehead
, 169 Ill. 2d 355, 371 (1996). On his direct appeal in this case, defendant argued, 
inter alia
, that the trial court erred in excluding the testimony of three other persons who were allegedly abused by Dwyer. Defendant sought to introduce this evidence to corroborate his testimony that he was abused by Dwyer and Lotito. The State's motion 
in limine
 to exclude this testimony was granted by the trial court. This court affirmed. In reaching this holding, we discussed the admissibility of evidence of prior police brutality in this context. We noted that one of the requirements for admitting such evidence is that in both the prior allegation of abuse and the case before the court, there is evidence of injury consistent with police brutality. We then concluded that defendant had not shown any injuries which were consistent with the police brutality he alleged. Consequently, we held that the trial court did not err in excluding defendant's proffered testimony of prior police brutality. 
Hobley
, 159 Ill. 2d at 311-12.

In his post-conviction petition, defendant argues that he now has additional evidence that other suspects were physically abused at Area 2. We held on direct appeal that it was not error to exclude defendant's evidence of prior police brutality because defendant has not shown any injuries commensurate with his alleged beatings. Defendant's “new” evidence does not alter that fact. Defendant does not submit any new evidence to demonstrate that he suffered any physical injuries in addition to those that were revealed in the record on direct appeal. Rather, defendant only submits evidence of additional alleged incidents of prior police abuse at Area 2. Accordingly, what this court found to be lacking in defendant's position on direct appeal is still lacking. Our determination on direct appeal that defendant did not suffer injuries consistent with his claims of abuse is not altered by defendant's new evidence. This issue is therefore barred by 
res judicata
. See 
People v. Thomas
, 164 Ill. 2d 410, 433-34 (1995) (issue decided on direct appeal was 
res judicata
 in post-conviction proceeding even though defendant submitted new facts in support of issue); 
People v. Thompkins
, 161 Ill. 2d 148, 176 (1994) (argument that confession should have been suppressed was decided on direct appeal and was therefore 
res judicata
 in post-conviction proceeding and new evidence submitted by defendant did not warrant reconsideration of issue).

In the particular context of this case, fundamental fairness does not require that we relax the 
res judicata
 bar and revisit this issue. In order for newly discovered evidence to warrant a new trial, the evidence must be “ ` “of such conclusive character that it will probably change the result on retrial.” ' ” 
People v. Silagy
, 116 Ill. 2d 357, 368 (1987), quoting 
People v. Molstad
, 101 Ill. 2d 128, 134 (1984), quoting 
People v. Baker
, 16 Ill. 2d 364, 374 (1959). Defendant here argues that his new evidence of other alleged incidents of police brutality would likely alter the result on retrial because it would convince the trier of fact that his alleged confessions were coerced and involuntary. We note, however, that at trial, as well as at the suppression hearing, defendant testified that he did not make any confessions in this case. He testified that he was physically abused by Dwyer, Lotito and Garrity, but that he did not confess to setting the fire. Thus, it has consistently been defendant's position in this case that he did not make any confessions. Defendant supported this contention by his own testimony and by the testimony of an attorney who testified that he saw defendant immediately after the alleged confession to police and defendant told him he had not confessed. Defendant also introduced evidence of a videotape of a news report in which he, shortly after the alleged confession to police, stated to reporters that he had not committed this crime. Defendant also elicited testimony from the police officers who testified to his confessions that they had no contemporaneous documentation of his alleged confessions. Defense counsel argued these points to the jury during closing argument.

In order to demonstrate the “conclusive” effect of the new brutality evidence, defendant argues that this evidence would have convinced the jury that his confessions were the product of police brutality. This argument is, of course, inconsistent with the position defendant took throughout the trial and with his own testimony that he did not make any confessions. Accordingly, in order for the jury to have concluded that defendant's confessions were coerced, the jury would have had to believe defendant's testimony that he was physically abused, but disbelieve his testimony that he did not confess. Thus, the contention that defendant confessed but that the confession was the product of coercion was not a particularly persuasive one for the defense. For this reason, we conclude that it is not likely that, had this new evidence of brutality allegations been introduced, the jury would have concluded that defendant's confessions were coerced. Defendant's primary challenge to the confessions was that they were fabricated by police, and evidence that other suspects were allegedly coerced into confessing would not have directly aided that position.

For the foregoing reasons, we hold that defendant is not entitled to an evidentiary hearing on his claim that a new trial is warranted because of newly discovered evidence of police brutality at Area 2.

IV. Ineffective Assistance of Counsel Claims

Defendant raises three claims of ineffective assistance of counsel. Defendant contends that he is entitled to an evidentiary hearing on these claims. In this context, an evidentiary hearing is required only if the allegations of the petition, supported by the trial record and any accompanying affidavits, make a substantial showing of a violation of defendant's constitutional right to the effective assistance of counsel. See 
Del Vecchio
, 129 Ill. 2d at 279. To prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate both that his defense counsel's performance was deficient and that, but for defense counsel's deficient performance, the result of the proceeding would have been different. 
Strickland v. Washington
, 466 U.S. 668, 687, 694, 80 L. Ed. 2d 674, 693, 698, 104 S. Ct. 2052, 2064, 2068 (1984).

A. Failure to Adequately Investigate Police Torture

Defendant first contends that his trial counsel were ineffective for failing to adequately investigate his claims of police torture. This contention is related to his newly discovered evidence claim addressed in part III. Defendant here argues that his trial counsel should have located the information appended to his post-conviction petition in support of that claim, to the extent that it predates his trial. Had his counsel obtained this information, defendant asserts, they could have used it to support his testimony at trial.

We concluded earlier in this opinion that it is not likely that, had additional evidence of brutality allegations been introduced at trial, the jury would have concluded that defendant's confessions were coerced. Accordingly, we cannot conclude here that the outcome of defendant's trial would have been different, but for counsel's failure to obtain the same information. Defendant has therefore failed to meet the prejudice prong of 
Strickland
. This argument is rejected.

In a related argument, defendant insists that his counsel were ineffective for failing to procure evidence regarding his medical condition before his arrest. He claims that this information was readily available because, after the fire, he was treated by paramedics and taken to a hospital. Defendant asserts that, had his counsel interviewed the medical personnel who treated him and obtained his medical records, counsel would have obtained evidence of his physical condition before his arrest, which could have been compared to the injuries he had on January 7, 1987.

Defendant has not attached any affidavits or other material to his post-conviction petition in support of this claim. Without such, this claim is waived because it could have been presented on direct appeal. See 
Whitehead
, 169 Ill. 2d at 371. Were we to address this claim on its merits, however, it would fail. Defendant is entitled to an evidentiary hearing only if the allegations of his post-conviction petition, supported by the trial record and any accompanying affidavits, make a substantial showing of a violation of his constitutional right to effective assistance of counsel. See 
Del Vecchio
, 129 Ill. 2d at 279. Defendant's claim here rests upon pure speculation. There has been no showing that information pertaining to defendant's overall physical condition was readily available from the paramedics or hospital personnel who treated him. More particularly, there has been no showing that any of these medical personnel even viewed defendant's chest, much less noted that it was free of bruises. Consequently, defendant has not made the required showing to warrant an evidentiary hearing on this claim.

B. Failure to Move to Suppress

or Object to Identification Testimony

Defendant next argues that his trial counsel were inadequate for failing to move to suppress or object to the identification testimony of Kenneth Stewart. Stewart was the service station attendant who identified defendant at trial as the man who purchased gasoline from him before the fire. At trial, Stewart testified that he witnessed a lineup at 4 p.m. on January 6, 1987. In his testimony Stewart candidly admitted that, at the lineup, he stated that he thought defendant was the man, but that he could not tell with “any degree of certainty.” Stewart told police during the lineup that defendant “favored” the man who purchased the gasoline.

Defendant attached an affidavit from Stewart to his post-conviction petition. In it, Stewart avers that he was asked by police to view the lineup to identify the man who purchased the gasoline. The lineup consisted of five African-American men, one of whom was shorter than the other four. Stewart was not able to identify anyone. Stewart was still not able to make an identification after going into the lineup room and listening to the men ask for “$1.50 worth of gas.” Stewart felt pressured by a prosecutor to make a positive identification. Stewart was asked “if any of the men more likely than not was the man,” and Stewart picked out defendant, the shortest man. At trial, Stewart identified defendant as the man who purchased the gasoline “although [he] was not certain.” Stewart did not recall being contacted by the defense before trial. Defendant now asserts that the failure of his trial counsel to obtain this information from Stewart constitutes ineffective assistance. He argues that counsel should have filed a motion to suppress Stewart's identification and that, without this information, counsel could not have made a strategic choice about whether to file the motion to suppress.

The record of defendant's trial, however, reveals that counsel had almost all this information and used it. Steven Stern, the attorney who represented defendant during the lineup, testified that he viewed the lineup and Stewart's identification. Stern informed the jury that on several occasions Stewart failed to make an identification, that he again made no identification after he heard each person ask for $1.50 worth of gas, that he declined to rate his certainty of identification on a scale of 1 to 10, and that he finally identified defendant only when asked if it was more likely than not that someone in the lineup was the person. Therefore, the information that defendant now asserts should have been presented to the jury by trial counsel was in fact presented to them through Stern's testimony. Trial counsel used this information at trial in an effort to cast doubt on Stewart's identification testimony. Defendant has thus failed to show any deficiency in the performance of his counsel.

Defendant nonetheless asserts that his counsel was deficient because they should have filed a motion to suppress rather than presenting Stern's testimony at trial. To show deficiency, a defendant must overcome the strong presumption that the challenged action or inaction of counsel was the product of sound trial strategy and not of incompetence. 
People v. Barrow
, 133 Ill. 2d 226, 247 (1989). The decision whether to file a motion is a matter of trial strategy which will be accorded great deference. 
People v. Wilson
, 164 Ill. 2d 436, 454-55 (1994). Here, the decision by counsel to present this information at trial rather than file a motion to suppress was a sound strategic decision. Defendant's ineffectiveness claim thus fails.

C. Failure to Secure a Witness' Presence at Trial

Defendant contends that his trial counsel were ineffective for failing to secure the presence of Angela McDaniel so that she could testify on his behalf at trial. This claim was raised and adjudicated on defendant's direct appeal. 
Hobley
, 159 Ill. 2d at 305-06. Defendant asserts, however, that the doctrine of 
res judicata
 does not apply here because his claim is based on information outside the record. He points to an affidavit by McDaniel, attached to his post-conviction petition. Defendant's claim can be considered if it depends upon facts found in this affidavit that are outside the record on direct appeal. See 
Whitehead
, 169 Ill. 2d at 372-73.

In her affidavit, McDaniel attests that she was living in Philadelphia during defendant's trial, and that she was never contacted by anyone working on defendant's behalf. She further states that the police treated her badly when they questioned her about the fire the day after it happened. She was called a “bitch” and a “ho” and accused of setting the fire. She was held at the station on 11th and State from about noon until midnight. McDaniel also avers that, although her grandmother Ollie Portwood testified that McDaniel was playing in her backyard on the night of the fire, McDaniel was not. Her grandmother now suffers from Alzheimer's Disease. The facts alleged in McDaniel's affidavit are not contained in the record on direct appeal. We therefore consider the merits of this claim.

The record of defendant's trial reveals that the State obtained a court order to secure McDaniel's testimony at trial on behalf of the State. The trial court also gave defense counsel permission to interview McDaniel before she testified. Despite the court order, McDaniel never appeared. McDaniel's grandmother testified at trial and informed the jury that she did not know McDaniel's whereabouts. Although McDaniel's affidavit now avers that she was living in Philadelphia at the time of trial, there has been no showing that McDaniel could have been found by defense counsel, or that she would have been willing to testify on defendant's behalf had she been located. Indeed, the absence of these averments suggests exactly the opposite.

Even assuming for the sake of argument that McDaniel could have been located and would have offered the testimony contained in her affidavit, that testimony does little to help defendant's case. At a hearing on a motion to suppress, defense counsel were informed that McDaniel told the detectives who interviewed her that before the fire defendant had expressed a desire to reconcile, and that he had asked her to move in with him, his wife and son. McDaniel had refused and told defendant that he must choose between his wife and her. As this court explained on direct appeal, this testimony would have been harmful to defendant. It directly supports the State's theory of the case that defendant murdered his wife and son to be with McDaniel. Nothing in McDaniel's newly obtained affidavit rebuts this harmful testimony. Defendant nonetheless asserts that McDaniel's statements regarding the police misconduct and Portwood's testimony are enough to render his counsels' failure to secure her testimony constitutionally ineffective. We disagree. Although this testimony may have aided defendant to some degree, defendant has failed to make a showing that McDaniel's testimony would have proved more helpful than harmful to his case. Without the required showing of prejudice, defendant's claim of ineffective assistance of counsel must fail.

In conclusion, defendant has not made a substantial showing that his constitutional right to effective assistance of counsel was violated at his trial, in any respect. Defendant is therefore not entitled to an evidentiary hearing on these claims.

V. Juror Affidavits

Defendant next contends that he is entitled to an evidentiary hearing on his claims that the jurors were exposed to extraneous information and outside influences which prejudiced their deliberations. Defendant attached the affidavits of several jurors to his post-conviction petition. Based upon these affidavits, defendant asserts that: jurors were intimidated by nonjurors during their deliberations; jurors were prejudiced by the acts of the jury foreperson; jurors brought newspapers with articles about the case into the jury room; the jurors were subjected to intolerable physical conditions during deliberations; and jurors repeatedly violated the trial court's sequestration order. Defendant claims that, as a result of these improper influences on the jury, he was deprived of due process under both the federal and the Illinois constitutions.

As a general rule, a jury verdict may not be impeached by the testimony of the jurors. 
People v. McDonald
, 168 Ill. 2d 420, 457 (1995); 
People v. Holmes
, 69 Ill. 2d 507, 511 (1978). It is well settled that a statement by a juror taken after the jury has rendered its verdict, has been polled in open court, and has been discharged will not be admitted to impeach the jury's verdict. 
McDonald
, 168 Ill. 2d at 457; 
People v. Towns
, 157 Ill. 2d 90, 112 (1993). This rule prevents the admission of a juror's affidavit to show the “motive, method or process by which the jury reached its verdict.” 
Holmes
, 69 Ill. 2d at 511. The sound public policy considerations underlying this rule were well stated by the United States Supreme Court in 
Tanner v. United States
, 483 U.S. 107, 97 L. Ed. 2d 90, 107 S. Ct. 2739 (1987):

“ `[If it is] established that verdicts solemnly made and publicly returned into court can be attacked and set aside on the testimony of those who took part in their publication [then] all verdicts could be, and many would be, followed by an inquiry in the hope of discovering something which might invalidate the finding. Jurors would be harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict. If evidence thus secured could be thus used, the result would be to make what was intended to be a private deliberation, the constant subject of public investigation–to the destruction of all frankness and freedom of discussion and conference.' ” 
Tanner
, 483 U.S. at 119-20, 97 L. Ed. 2d at 105-06, 107 S. Ct. at 2747, quoting 
McDonald v. Pless
, 238 U.S. 264, 267-68, 59 L. Ed. 1300, 1302, 35 S. Ct. 783, 784 (1915).

The rule against admitting juror testimony to impeach a verdict does not, however, preclude juror testimony or affidavits which are offered as proof of improper extraneous influences on the jury. 
Holmes
, 69 Ill. 2d at 512-14; see also 
Tanner
, 483 U.S. at 120, 97 L. Ed. 2d at 106, 107 S. Ct. at 2747-48. This court has held that a juror should be permitted to testify “ `whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror.' ” 
Holmes
, 69 Ill. 2d at 516, quoting Fed. R. Evid. 606(b). A jury verdict will be set aside as a result of outside influences or communications only if the defendant was prejudiced as a result of the improper communication or outside influence. 
People v. Tobe
, 49 Ill. 2d 538, 542 (1971); 
People v. Mills
, 40 Ill. 2d 4, 14 (1968). In order to demonstrate such prejudice, jurors may testify as to the nature of outside influences or communications, but evidence relating to the effect of such influences on the mental processes of the jurors is inadmissible. 
Holmes
, 69 Ill. 2d at 514. Accordingly, because the actual effect of the conduct on the minds of the jurors cannot be proved, the standard to be applied is whether the conduct involved “ `such a probability that prejudice will result that it is [to be] deemed inherently lacking in due process.' ” 
Holmes
, 69 Ill. 2d at 514, quoting 
Estes v. Texas
, 381 U.S. 532, 542-43, 14 L. Ed. 2d 543, 550, 85 S. Ct. 1628, 1633 (1965); see also 
Tobe
, 49 Ill. 2d at 544.

With these principles in mind, we consider each of defendant's claims of improper jury influence.

A. 
Intimidation by Nonjurors

Defendant first claims that he was deprived of due process because some of the jurors were subjected to intimidation by nonjurors during their sequestered deliberations. The affidavits of jurors Crandall, Sanchez and Schab each described an incident that occurred while the jury was sequestered at a hotel. While they and several other jurors were dining in the hotel restaurant, several men sitting in the same area learned that they were the Hobley jury. Each juror stated that the men made comments to them to the effect that “you know he's guilty,” and “give him the death penalty.” Juror Sanchez described that the men “yelled out, `Hang the motherfucker.' ” Juror Sanchez further stated that the incident “upset quite a few of the jurors” and that she herself “was scared and felt that my life was in danger.” Juror Crandall stated that the incident “upset” her and that she saw that other jurors were “noticeably upset.” Juror Wodka, who was not present when this incident took place, related the incident “secondhand” and stated that the jurors who were present were “extremely shaken.” Defendant argues that these affidavits make a substantial showing that he was deprived of due process because some jurors were subjected to prejudicial outside influences.

We find that defendant is entitled to an evidentiary hearing on this claim. As stated above, the rule against admitting juror testimony to impeach a verdict does not preclude testimony showing that prejudicial outside influences were brought to bear upon the jury. 
Holmes
, 69 Ill. 2d at 516. Long ago, the United States Supreme Court recognized that “[p]rivate communications, possibly prejudicial, between jurors and third persons, or witnesses, or the officer in charge, are absolutely forbidden, and invalidate the verdict, at least unless their harmlessness is made to appear.” 
Mattox v. United States
, 146 U.S. 140, 150, 36 L. Ed. 917, 921, 13 S. Ct. 50, 53 (1898); see also 
Remmer v. United States
, 347 U.S. 227, 229, 98 L. Ed. 654, 656, 74 S. Ct. 450, 451 (1954). The standard to be applied in such a situation was explained by this court in 
People v. Mitchell
, 152 Ill. 2d 274 (1992):

“ `It is well settled in Illinois that any communication with a juror during trial about a matter pending before the jury is deemed presumptively prejudicial to a defendant's right to a fair trial. Although this presumption of prejudice is not conclusive, the burden rests upon the State to establish that such contact with the jurors was harmless to defendant. [Citations.] A verdict will not be set aside where it is obvious that no prejudice resulted from a communication to the jury, either by the court or by third persons outside the presence of the defendant.' ” 
Mitchell
, 152 Ill. 2d at 341, quoting 
People v. Harris
, 123 Ill. 2d 113, 132 (1988).

See also 
People v. Childs
, 159 Ill. 2d 217, 228 (1994) (burden on State to prove 
ex parte
 communication between judge and jury was harmless).

 The Supreme Court invalidated a conviction on the basis of improper communications with the jury in 
Parker v. Gladden
, 385 U.S. 363, 17 L. Ed. 2d 420, 87 S. Ct. 468 (1966). Following his conviction for second degree murder, the defendant in 
Parker
 filed a petition for post-conviction relief alleging that a court bailiff had engaged in prejudicial communications with the jury. At a hearing on the petition, it was revealed that the court bailiff assigned to shepherd the sequestered jury had stated to one of the jurors, in the presence of others: “ `Oh that wicked fellow [the defendant], he is guilty.' ” On another occasion, the bailiff stated to jurors: “ `If there is anything wrong [in finding the defendant guilty] the Supreme Court will correct it.' ” 
Parker
, 385 U.S. at 363-64, 17 L. Ed. 2d at 422, 87 S. Ct. at 470. The Supreme Court upheld the state trial court's determination that the defendant was entitled to a new trial because the unauthorized communication was prejudicial to the defendant. The Court concluded that it would be “ `blinking reality not to recognize the extreme prejudice inherent' in such statements.” 
Parker
, 385 U.S. at 365, 17 L. Ed. 2d at 423, 87 S. Ct. at 471, quoting 
Turner v. Louisiana
, 379 U.S. 466, 473, 13 L. Ed. 2d 424, 429, 85 S. Ct. 546, 550 (1965).

The effect of an outside influence on a juror was also considered in 
Remmer v. United States
, 347 U.S. 227, 98 L. Ed. 654, 74 S. Ct. 450 (1954). There, the defendant was convicted by a jury of evasion of federal income taxes. After the verdict was returned, the defendant learned for the first time that, during the trial, a juror had been the subject of an attempted bribe. The juror reported the bribe to the trial judge, who informed the prosecutors. A federal investigation was conducted. The investigators concluded that the “bribe attempt” was made in jest and nothing further was done about the matter. Based upon this information, the defendant filed a motion for a new trial and requested a hearing to determine the circumstances surrounding the incident and its effect on the jury. The district court denied the motion without a hearing. The Supreme Court reversed. The Court noted that private communications with a juror during trial about the matter pending before the jury are considered presumptively prejudicial. The Court went on to hold that a hearing was required because it could not be ascertained from the record what actually transpired or whether the incident prejudiced the defendant. Accordingly, the Court remanded the cause to the district court with directions to conduct a hearing “to determine whether the incident complained of was harmful to the petitioner, and if after hearing it is found to have been harmful, to grant a new trial.” 
Remmer
, 347 U.S. at 230, 98 L. Ed. at 656, 74 S. Ct. 451-42; see also 
Stockton v. Virginia
, 852 F.2d 740, 745 (4th Cir. 1988) (new capital sentencing required as a result of third party's comment to deliberating jurors that “they ought to fry the son-of-a-bitch”).

In this case, we find that the affidavits submitted by defendant are sufficient to warrant an evidentiary hearing to determine whether the incident in the hotel dining room resulted in prejudice to defendant. Four jurors submitted affidavits establishing that a group of men made comments to them about the Hobley trial. Although the exact language of the comments differed among the affidavits, each relayed that the men urged the jurors both to find defendant guilty and to sentence him to death. At least one of the jurors relayed that the men “yelled” at them to “Hang the motherfucker.” In addition, two of the jurors stated that they were “upset” by the comments and that other jurors were “noticeably upset.” Juror Sanchez elaborated that she felt her life was in danger as a result of the incident. Under these facts, defendant made a sufficient showing of possible prejudice from the incident to warrant an evidentiary hearing into the matter.

The State argues that this claim was properly dismissed because defendant did not make a sufficient showing of prejudice resulting from the hotel incident. We disagree. As stated above, the law is well established that communications about the case between jurors and third parties are presumptively prejudicial. 
Mitchell
, 152 Ill. 2d at 341; 
Harris
, 123 Ill. 2d at 132. In such a case, the verdict may stand only if it is “obvious” that no prejudice resulted from the communication. See 
Harris
, 123 Ill. 2d at 132. Considering the juror affidavits provided by defendant, we cannot conclude that it is obvious that no prejudice resulted from the hotel incident. The State seems to contend that defendant was required to submit juror affidavits which stated that the incident, in fact, prejudiced them against defendant. This court has stated, however, that, although jurors may testify as to communications and outside influences, “evidence relating to the effect of such influences on the mental processes of jury members is inadmissible.” 
Holmes
, 69 Ill. 2d at 514. We find that defendant is entitled to an evidentiary hearing on this claim.

B. 
Conduct of Jury Foreperson

Defendant next claims that he was prejudiced by the improper conduct of the foreperson of the jury, Matthew Evans. Defendant contends that Evans, a police officer, sought to intimidate other jurors, and offered himself as an “expert” in the area of proper police conduct. In support of the intimidation allegation, defendant relies on statements in the juror affidavits that Evans “wanted everyone to know that he was a police officer,” and that he showed everyone his gun on the first day of jury selection. One juror also stated that Evans “said that Hobley was guilty and that our decision was going to be unanimous,” and that Evans and other jurors “wore her down” and persuaded her to change her vote to guilty, even though she was still not convinced that defendant was guilty. The affidavits also related that Evans “elected himself as foreman.”

Defendant claims that Evans' conduct in bringing a gun into the jury room, electing himself foreman and otherwise “intimidating” the other jurors constituted an improper extraneous influence on the other jurors. We disagree. Defendant's claim in this regard does not concern an outside influence on the jury but, rather, goes to the “motive, method or process” by which the jury reached its verdict. Defendant seeks to show how a particular juror influenced other jurors during the deliberations. The evidence offered by defendant pertains to the deliberative process of the jury in reaching a verdict and, as such, may not be used to impeach the jury verdict. See 
Towns
, 157 Ill. 2d at 112. In 
Towns
, the defendant sought to impeach the jury's death verdict by means of an affidavit of a juror which stated that, after a vote of 9 to 3 in favor of a death sentence, the foreperson told the other jurors that they were “bound” to vote for the death penalty. This court held that this information pertained to the deliberative process of the jury and therefore could not be used to impeach the verdict. 
Towns
, 157 Ill. 2d at 112; 
Tanner v. United States
, 483 U.S. 107, 97 L. Ed. 2d 90, 107 S. Ct. 2739 (1987) (defendant could not impeach verdict with juror testimony that, during trial, jurors regularly used alcohol and drugs). We therefore find that defendant is not entitled to an evidentiary hearing on his claim that Evans intimidated other jurors.

Defendant also claims that Evans improperly gave “expert” testimony in the area of proper police conduct. The affidavit of juror Crandall stated that, while the jury was discussing the issue of whether defendant had been beaten by the police, Evans stated that, as a police officer, he had been in similar situations and he knew that the officers' actions in this case were proper. Evans further stated that the other jurors did not understand what it is like to be a police officer and that the police are there to protect us from criminals. Defendant claims that these statements by Evans constituted improper “evidence” brought to the jury's attention.

Defendant correctly points out that jurors must decide a case based upon the evidence presented in court and may not conduct their own independent investigation of the case. See 
Holmes
, 69 Ill. 2d at 516-19; 
People v. Gilbert
, 68 Ill. 2d 252, 259 (1977); 
People v. Szymanski
, 226 Ill. App. 3d 115, 121 (1992). Further, the rule against verdict impeachment does not preclude juror testimony that such extraneous information was considered. 
Holmes
, 69 Ill. 2d 507. Defendant's attempt to classify Evans' conduct within this category of cases, however, is not persuasive. In 
Holmes
, for instance, this court reversed a defendant's conviction where it was established that members of the jury had improperly conducted their own investigation concerning certain evidence. 
Holmes
, 69 Ill. 2d at 519. Here, Evans did not conduct an independent investigation of the case. Rather, Evans simply offered his opinion on matters of credibility based upon his particular experience as a police officer. Jurors are entitled to consider the evidence presented in light of their own “knowledge and observation in the affairs of life.” 
People v. Rogers
, 16 Ill. 2d 175, 182 (1959). Accordingly, no improper “evidence” was interjected into the jury's deliberations in this case. Defendant's claim in this regard was properly dismissed as an attempt to impeach the jury's verdict with evidence regarding the method and process by which the verdict was reached. An evidentiary hearing is therefore not required on this claim.

C.
 Newspapers in Jury Room

Defendant next claims that prejudice resulted because several newspapers which contained articles about the case were brought into the jury room. Juror Crandall's affidavit stated that she brought the Chicago Tribune into the jury room each day where it was read by various jurors. Crandall stated that, after the trial ended, her daughter informed her that the newspapers she had brought into the jury room contained articles about the trial. Juror Wodka stated in her affidavit that there were Chicago newspapers in the jury room which were supplied by the bailiff. Wodka further stated that, at one point, a juror was talking about an article on the trial in one of the newspapers. Copies of various articles concerning the trial were attached to defendant's post-conviction petition.

The circuit court ruled that defendant failed to show any prejudice resulted from the presence of the newspapers in the jury room. We find that the circuit court's ruling on this issue was not manifestly erroneous. Assertions of juror exposure to media coverage do not by themselves warrant a new trial. See 
People v. Britz
, 123 Ill. 2d 446, 466-70 (1988); 
People v. Silagy
, 116 Ill. 2d 357, 366 (1987). Rather, the defendant must show that prejudice resulted from the exposure. See 
Britz
, 123 Ill. 2d at 466-70 (defendant not deprived of fair and impartial jury because some jurors had read pretrial newspaper article about the case); 
Silagy
, 116 Ill. 2d at 366.

In this case, defendant made no showing of prejudice resulting from the presence of newspapers in the jury room. Although juror Crandall stated that she brought a newspaper into the jury room each day, she also stated that she did not even realize until after trial that these papers had contained articles about the trial. Only juror Wodka's affidavit suggested that any juror actually read an article about the trial. Wodka did not, however, state who this juror was or indicate the nature of the article the juror was discussing. Defendant attached a number of newspaper articles concerning the trial to his post-conviction petition. There is no showing, however, that any of these articles were actually read by any juror. Consequently, there is no basis for concluding that any juror read a newspaper article which contained material prejudicial to defendant. See 
People v. Torres
, 54 Ill. 2d 384, 390 (1973) (jurors' minimal exposure to media coverage of the case did not prejudice the defendant).

 D. 
Intolerable Physical Conditions

Defendant also contends that the jury's deliberations were prejudiced because the jurors were subjected to “intolerable” physical conditions in the jury room. In support of this claim, defendant refers to statements in the juror affidavits indicating that, for two days during their deliberations, the air conditioning was not working in the jury room, and some jurors ran out of clothes and money while they were sequestered. Defendant claims that these physical “hardships” constituted an improper outside influence on the jury's deliberations, which resulted in prejudice to him.

The circuit court properly dismissed this claim without an evidentiary hearing. In this claim, defendant attempts to show that some jurors reached their verdict because they were hot, or running out of clothes or money. Defendant asserts no extraneous influence on the jury's deliberations, but seeks simply to show the method, motive or process by which the jury reached its verdict. This claim was therefore properly dismissed.

E. 
Violations of Sequestration Order

Finally, defendant argues that prejudice resulted because a number of jurors left their hotel rooms in violation of the trial court's sequestration order. Defendant claims that these unsupervised absences created the “possibility” of juror exposure to improper influences. The circuit court properly dismissed this claim. Defendant has produced no evidence that any of the jurors who violated the sequestration order actually were subjected to improper outside influences. No evidentiary hearing on this claim is warranted.

VI. Death Penalty Instructions

Defendant last asserts that the instructions given to the jury at the second stage of the sentencing hearing were unconstitutionally vague. Defendant contends that, as a result of these instructions, the jury erroneously believed they had to agree unanimously in order to reach a verdict of imprisonment. Defendant argues that studies conducted by Professor Hans Zeisel and Professor Shari Diamond, coupled with the affidavits of several jurors in his case, demonstrate that the instructions are constitutionally infirm. We disagree.

Both the Zeisel and the Diamond studies purported to test the ability of potential jurors to comprehend certain Illinois death penalty instructions. The 1990 Zeisel study, which concluded that the instructions resulted in misunderstanding and confusion, formed the basis for a federal district court's holding that the death penalty instructions were constitutionally infirm. 
Free v. Peters
, 806 F. Supp. 705 (N.D. Ill. 1992). The Seventh Circuit Court of Appeals, however, reversed the district court's holding. 
Free v. Peters
, 12 F.3d 700 (7th Cir. 1993); see also 
Gacy v. Wellborn
, 994 F.2d 305 (7th Cir. 1993). This court has repeatedly agreed with the Seventh Circuit that the Zeisel study does not establish that the Illinois death penalty instructions are constitutionally infirm. See 
People v. Jackson
, No. 79243, slip op. at 47 (March 26, 1998); 
People v. Brown
, 172 Ill. 2d 1, 55-56 (1996); 
People v. Williams
, 161 Ill. 2d 1, 59 (1994).

 Defendant nonetheless claims that we should reconsider our holdings on this issue on the basis of the study by Professor Diamond, conducted after the Zeisel study. The Diamond study was designed to address two of the primary objections to the Zeisel study: (1) that the Zeisel study did not use a control group to determine whether revised jury instructions would improve performance, and (2) that the Zeisel study did not take into account juror deliberations. The results of the Diamond study confirmed the conclusion of the Zeisel study that the death penalty instructions were confusing.

This court has already rejected the contention that the Diamond study provides a basis for invalidating the Illinois death penalty jury instructions. See 
Jackson
, slip op. at 47; 
Brown
, 172 Ill. 2d at 56-57. In 
Brown
, we stated that we were not persuaded by the Diamond study that the death penalty instructions were constitutionally infirm. In reaching this holding, we reasoned that:

“[A]lthough the Diamond study claims to correct two deficiencies in the Zeisel study, there still remain more generalized problems with the research. Perhaps the most fundamental objection is the `lack of comparability between the test setting and the sentencing hearing.' See 
Free
, 12 F.3d at 705. There is no reason to suppose that actual jurors who have sat though trial and a sentencing hearing would respond to the sentencing instructions in the same way as the test subjects who simply listened to an audiotaped description of the evidence presented in the case and an audiotape of the instructions, as was done in the Diamond study.” 
Brown
, 172 Ill. 2d at 57.

The State asserts that 
Brown
 is controlling here. Defendant contends, on the other hand, that 
Brown
 does not dispose of his argument in this case because he has provided, in the form of juror affidavits, the “comparability” found to be missing in 
Brown
. Defendant claims that the juror affidavits he attached to his post-conviction petition establish that the jurors in his case were misled by the instructions in the same way as the Diamond test subjects. We disagree. Even if we accept that juror affidavits may be used for this purpose, the juror statements here do not provide “comparability” for the results of the Diamond study.

Defendant claims that the jury instructions misled the jury as to the need for unanimity in order to impose a sentence other than death. The Diamond study tested comprehension in the area of “non-unanimity on mitigators,” explained as “juror understanding that a juror can consider a factor in mitigation even if other jurors disagree.” The Diamond study apparently concluded that revised instructions on this issue produced a significant increase in comprehension. The juror affidavits in this case, however, do not reveal that these jurors were misled “in the same way” as the Diamond test subjects. With regard to the unanimity issue, the jurors stated simply that they believed that they were required to reach a unanimous verdict at each stage of the proceedings. This statement is not entirely incorrect. In order to impose a death sentence, the jury was required to unanimously agree to do so. These statements do not demonstrate that any juror actually believed that they could not consider a factor as mitigating even if the other jurors did not consider it to be mitigating. Accordingly, these statements do not provide comparability for the Diamond study findings on this issue.

We note that defendant also points out that some jurors in this case stated that they found the jury instructions to be “confusing,” that they felt “obligated” to impose the death penalty as a result of their guilty verdict, and that they believed that defendant may be released on parole if they did not impose the death penalty. All of this information pertains to the method, motive or process by which the jurors reached their verdict. As such, this information may not be used to impeach the jury's verdict. There is no indication that the Diamond study tested comprehension of these issues. Thus, the study did not make any findings that may be “corroborated” by these juror statements.

For the foregoing reasons, we find that an evidentiary hearing is not warranted on defendant's claim that the death penalty instructions were unconstitutionally vague.

CONCLUSION

For the reasons stated above, the judgment of the circuit court of Cook County is affirmed in part and reversed in part. We reverse the circuit court's dismissal without an evidentiary hearing of two claims presented in defendant's post-conviction petition. We remand for an evidentiary hearing on the issue of whether the State violated defendant's constitutional rights under 
Brady
, as set forth in part I, and on the issue of whether the jurors were intimidated by nonjurors during their deliberations, as set forth in part V(A). The circuit court's dismissal of the remaining issues is affirmed. This cause is remanded to the circuit court for further proceedings consistent with this opinion.

Affirmed in part and reversed in part
;

cause remanded.